NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

MEGAN M., DUSTIN J., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, R.J., L.J., *Appellees.*

No. 1 CA-JV 14-0040
FILED 11-25-2014

---

Appeal from the Superior Court in La Paz County
No. S1500JD201200014 and S1500JD201200015
The Honorable Samuel E. Vederman, Judge

**AFFIRMED**

---

COUNSEL

La Paz County Public Defender's Office, Parker
By Sandra Carr
*Counsel for Appellants*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge John C. Gemmill delivered the decision of the Court, in which
Presiding Judge Patricia K. Norris and Judge Lawrence F. Winthrop joined.

---

**G E M M I L L,** Judge:

¶1        Megan M. and Dustin J. ("Parents") appeal the juvenile court's termination of their parental rights regarding their children R.J. and L.J.  Parents argue they were deprived of due process and they object to certain expert testimony.  They also assert that the termination order was contrary to state statute and the Indian Child Welfare Act.  For the following reasons, we affirm.

## BACKGROUND

¶2        Dustin J. ("Father") and Megan M. ("Mother") are the biological parents of L.J., born in 2012.  Father is also the biological father of R.J., born in 2010.[1]  Both R.J. and L.J. are subject to the Indian Child Welfare Act ("ICWA") because Father is an enrolled member of the Choctaw tribe.

¶3        Having used marijuana throughout her pregnancy, Mother tested positive for THC at the birth of L.J., at which time the Arizona Department of Economic Security ("DCS") intervened.[2]  In October 2012, DCS filed dependency petitions for both R.J. and L.J.  In July 2013, DCS filed motions for termination of the parent child relationship for R.J. and L.J.

¶4        The juvenile court found that the following statutory grounds for termination had been proven against both Father and Mother: Arizona Revised Statutes ("A.R.S.") sections 8-533(B)(2); 8-533(B)(3); and 8-

---

[1]  The juvenile court terminated the parental rights of R.J.'s biological mother, and she is not a party to this appeal.

[2]  Child Protective Services (CPS) was formerly a division of the Arizona Department of Economic Security (ADES).  Effective May 29, 2014, the Arizona legislature repealed the statutory authorization for creation of CPS and for ADES's administration of child welfare and placement services under title 8, and the powers, duties, and purposes from those entities were transferred to the newly established DCS.  *See* 2014 Ariz. Sess. Laws 2d Spec. Sess., ch. 1, §§ 6, 20, 54.  Accordingly, DCS has been substituted for ADES in this matter.  *See* Ariz. R. Civ.App. P. 27(b).  For simplicity, our references to DCS in this decision encompass both ADES and the former CPS, as appropriate.

533(B)(8)(b). The court also found that severance was in the best interests of the children. The juvenile court terminated Father and Mother's parental rights in January 2014.

**¶5** Father and Mother timely appeal the severance order. We have jurisdiction in accordance under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶6** This court reviews a juvenile court's termination order "in the light most favorable to sustaining the court's decision and will affirm it 'unless we must say as a matter of law that no one could reasonably find the evidence [supporting statutory grounds for termination] to be clear and convincing.'" *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 95, ¶ 10, 210 P.3d 1263, 1266 (App. 2009) (quoting *Murillo v. Hernandez*, 79 Ariz. 1, 9, 281 P.2d 786, 791 (1955)).

**¶7** Parents present three issues for review: (1) whether Parents were deprived of due process; (2) whether the juvenile court erred in accepting the testimony of the purported ICWA expert; and (3) whether the juvenile court erred in terminating Parents' rights.

### I.    The juvenile court did not deprive Parents of due process.

**¶8** First, Parents argue that they were deprived of their right to due process because they were not provided adequate resources and time to complete their case plan. While DCS is not required to provide "every conceivable service," it is required to provide parents with the time and opportunity to participate in services. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37, 971 P.2d 1046, 1053 (App. 1999) (quoting *Maricopa County Juv. Action No. JS-501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App. 1994)).

**¶9** Parents' initial case plan was effective on October 2012, with an initial review date of January 2013. Parents had nearly nine months to complete their case plan of reunification. In addition, Parents were aware that their case plan would be changed from reunification to termination if they failed to participate.

**¶10** Once R.J. and L.J. were removed, DCS created a case plan for Parents with the goal of reunification. DCS required Parents to maintain

drug-free lifestyles, obtain stable housing and income, exhibit age-appropriate parent skills, and address their domestic violence issues. DCS provided Parents with substance-abuse treatment, random urinalysis ("UA") testing, housing assistance, and parent-aide services, including supervised visitation and parenting-skill classes.

**¶11** In September 2013, Parents moved to Mesa. Parents testified they moved to Mesa because they were not receiving sufficient services for their case plan in La Paz County. However, there was sufficient testimony from experts that the resources offered in La Paz County were adequate to meet the needs of Parents.

**¶12** We conclude on this record that Parents have not established a due process deprivation based on lack of resources or time.

## II. The juvenile court did not err in admitting the testimony of Shane Haddock.

**¶13** Here, both R.J. and L.J are subject to ICWA because Father is a member of the Choctaw tribe. Under ICWA, a termination proceeding involving an Indian child requires the testimony of a qualified expert witness. 25 U.S.C. § 1912(f). Parents make three arguments challenging the legal sufficiency of the testimony of DCS's expert witness, Shane Haddock. First, Parents claim that there was a failure to provide timely and adequate disclosure of qualifications and the basis for Haddock's opinions. Second, Parents argue that Haddock is not a qualified expert witness. Lastly, Parents believe that the court erred by considering Haddock's non-cultural testimony as a basis for its ruling.

> a. *The juvenile court did not err regarding the timeliness of disclosure of the qualifications and basis for Haddock's opinions.*

**¶14** Parents assert that DCS failed to provide timely and adequate disclosure of Haddock's qualifications and the basis for his opinions as required under Rule 26.1 of the Arizona Rules of Civil Procedure. Juvenile court proceedings, however, are governed by the Rules of Procedure for Juvenile Court. Ariz. R.P. Juv. Ct. 1(A); *see also Yavapai County, Juvenile Action No. 7707*, 25 Ariz. App. 397, 399, 543 P.2d 1154, 1156 (App. 1979).

**¶15** We review the juvenile court's evidentiary rulings for an abuse of discretion. *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 239, ¶ 13, 282 P.3d 437, 440 (App. 2012). We will not reverse the ruling unless we find that there has been an abuse of discretion plus unfair prejudice or

misapplication of the law. *See Larsen v. Decker*, 196 Ariz. 239, 241, ¶ 6, 995 P.2d 281, 283 (App. 2000).

**¶16** Arizona Rule of Juvenile Procedure 44 indicates that, in termination proceedings, disclosures must be made within thirty days after the initial hearing. The parties must provide a list of witnesses that they intend to call at trial, "which shall include the names, addresses and telephone numbers of the witnesses in addition to a description of the substance of the witness' expected testimony." Ariz. R.P. Juv. Ct. 44(B)(2)(d).

**¶17** The initial termination hearing was held on August 7, 2013. On September 18, 2013, 42 days after the initial termination hearing, DCS disclosed a list of witnesses that they intended to call at the termination hearings. The disclosure regarding Haddock included his contact information as well as the following:

> Will testify as to the remedial services and rehabilitative programs offered to the family and the results thereof; that continued custody of the minor by the parent/Indian custodian would likely result[] in serious emotional or physical damage to the child; recommendations regarding placement and any other relevant matters.

**¶18** The Arizona Rules of Juvenile Procedure does not require the imposition of sanctions. Rather, Rule 44(G) states that the court "*may* impose sanctions" when disclosure requirements have been violated. (Emphasis added). Here, the disclosure was made more than two months before Haddock was to testify. Parents had adequate time to prepare to meet the anticipated testimony. The record does not disclose that late disclosure had an unfair prejudicial effect on Parents. Instead, the issue that Parents raise is that they "did not receive advanced notice that Haddock would simply parrot the opinions of CPS/ADES." On this record, we conclude that the juvenile court did not abuse its discretion in overruling Parents' objections based on the timeliness of disclosure.

**¶19** Additionally, to the extent Parents are arguing that DCS failed to adequately disclose the basis for Haddock's testimony under Rule 26.1 of the Arizona Rules of Civil Procedure, that rule does not apply in juvenile

court.[3] DCS substantially complied with the disclosure requirements of Juvenile Court Rule 44 and the record does not demonstrate reversible prejudice to Parents on this issue.

    b. *Haddock is a qualified expert witness.*

¶20 Parents further argue that Haddock is not a qualified witness under either Rule 702 of the Arizona Rules of Evidence or ICWA to render expert testimony here.

¶21 Arizona Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

¶22 The United States Department of the Interior Bureau of Indian Affairs has issued guidelines for state courts to consider when interpreting ICWA. *Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed. Reg. 67584 (1979) ("Guidelines"). Although the Guidelines are not controlling, Arizona courts frequently rely upon them. *See Brenda O. v. Ariz. Dep't of Econ. Sec.*, 226 Ariz. 137, 140, ¶ 14, 244 P.3d 574, 577 (App. 2010). In relevant part, the Guidelines identify the following categories of individuals who may qualify as ICWA expert witnesses:

> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices. (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the

---

[3] *See* Ariz. R.P. Juv. Ct. 44(E) (allow methods of discovery set in Rules 26-37 in Ariz. R. Civ. P. upon agreement or court order but does not require Rule 26.1 disclosure requirements).

Indian child's tribe. (iii) A professional person having substantial education and experience in the area of his or her specialty.

Guidelines D.4 (1979).

**¶23** Haddock is an Indian Child Welfare Social Worker employed by the Choctaw Nation of Oklahoma. By the time of his testimony, he had worked in that position for five and a half years, and he has a Bachelor's degree and a Master's degree in education. In addition, as an ICWA expert, Haddock is required to fulfill training requirements each year. The training deals primarily with ICWA and its requirements. Haddock also has familiarity with the customs, traditions, and child rearing practices of the Choctaw tribe. In conjunction with Parents' voir dire of Haddock to challenge his qualifications, DCS specifically cited to the Guidelines in arguing that Haddock was qualified as an ICWA expert. The juvenile court agreed and overruled Parents' objection.

**¶24** The admission or exclusion of expert testimony is a matter within the discretion of the juvenile court. *See Ruben M.*, 230 Ariz. at 239, ¶ 13, 282 P.3d at 440. In this case, there is sufficient evidence to find that Haddock is a qualified expert under both Rule 702 and the Guidelines under section D.4. The juvenile court did not err in allowing Haddock's testimony.

*c. Haddock was not required to address tribal culture.*

**¶25** Parents object that Haddock is not a tribal member and does not have specific knowledge and familiarity with the Choctaw tribe. Therefore, Parents point out that Haddock failed to make references to tribal culture during his testimony. However, "distinctive knowledge of Indian culture is necessary only when cultural mores are involved[.]" *Rachelle S. v. Ariz. Dep't of Econ. Sec.*, 191 Ariz. 518, 521, ¶ 14, 958 P.2d 459, 462 (App. 1998).

**¶26** The fundamental question before the juvenile court was whether there were statutory grounds to terminate the parent-child relationship based on neglect, chronic substance-abuse, and neglect or refusal to remedy the circumstances that caused the out-of-home placement and whether DCS had made the requisite efforts to reunify the family. The juvenile court was never given any cultural explanation for the circumstances that prompted the children's removal from parental custody.

Therefore, Haddock was not required to address specific cultural findings and explanations in his testimony.

### III. The juvenile court did not err in terminating the parental rights.

**¶27**         Finally, Parents argue the juvenile court erred in terminating their parental rights because the juvenile court did not base its findings on statutory grounds nor comply with ICWA.

a.   *The juvenile court had state statutory grounds for termination.*

**¶28**         There are two elements that the juvenile court must meet in order to terminate parental rights under state law.  First, the juvenile court must find by clear and convincing evidence that the facts of the case fulfill at least one of the statutory grounds for termination that are enumerated in A.R.S. § 8-533(B).  *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 176-77, ¶ 9, 319 P.3d 236, 238-39 (App. 2014).  If this court finds that there is sufficient evidence to support at least one of the statutory grounds on which the juvenile court ordered severance, we do not need to address any other statutory ground.  *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3, 53 P.3d 203, 205 (App. 2002).  Next, the juvenile court must find by a preponderance of the evidence that the termination would be in the child's best interests.  *Shawanee S.*, 234 Ariz. at 176-77, 319 P.3d at 238-39.

**¶29**         One of the three statutory subsections under which the juvenile court moved for severance was A.R.S. § 8-533(B)(8)(b).  As applicable here, DCS was required under § 8-533(B)(8)(b) to prove by clear and convincing evidence that (1) they had made diligent efforts to provide appropriate reunification services, (2) the children were under the age of three and had been in out-of-home placement for a cumulative total of six months or longer, and (3) that the parents had substantially neglected or willfully refused to remedy the circumstances that caused the out-of-home placement.  There is reasonable evidence in this record to support the juvenile court's findings and conclusion regarding this statutory ground for termination.

**¶30**         DCS made a diligent effort to provide for reunification. DCS submitted evidence that the parents were provided with services, assistance, and guidance.  Although Parents argue that it was difficult to complete their case plan in La Paz County, the juvenile court found that it

was Parents "who made the decision not to participate in the case plan in a manner that would have allowed for family reunification."

¶31        It is undisputed that both L.J. and R.J. were under the age of three and had been in out-of-home placement for at least six months when termination motions were filed.

¶32        Father and Mother both neglected to remedy the circumstances that caused their children to be placed in out-of-home placement.  As part of their case plan, Father and Mother were offered substance abuse treatment, visitations, parenting classes, and case management.  Furthermore, Father and Mother were required to submit to UA testing, gain employment, and find a suitable home.

¶33        DCS provided documentary evidence that Father and Mother had stopped submitting to UA testing in March 2013.  Throughout their case plan, Parents were aware that any missed UA tests would be considered negative.

¶34        Parents also failed to gain employment.  They argued that part of the reasoning for moving to Maricopa County was due to the lack of employment opportunities in La Paz County.  However, both Father and Mother had received offers of employment in La Paz County before their move to Maricopa County.  In addition, aside from a brief period in which Parents gained housing, they generally did not find suitable housing. Father and Mother also never completed their required substance abuse program or parenting classes.

¶35        Furthermore, Parents were inconsistent with their visitations. The visits became so inconsistent that DCS implemented a system in which Parents would call and confirm that they could attend before a parent aide was sent to facilitate the visitation.  Visitations continued to decrease as Father became ill with H. pylori, a bacteria which may cause ulcers.  It was reported that Father missed approximately five visitations per month.  DCS again modified the case plan to require that Parents not only call, but also report and wait in the DCS office, until the parent aide arrived.

¶36        The visitations continued to remain inconsistent.   When Parents did attend visits, the parent aide noted that Parents did not know how to properly feed or tend to the needs of the children.  The juvenile court ultimately stopped visitation when the parent aides noticed that the visits were having a detrimental impact on the children.

¶37 Parents argued that since they moved to Maricopa County, they have made significant strides toward completing their case plan. They testified that they have found a suitable home, gained employment, and have even completed parenting courses. The courses completed by Parents, however, were not equivalent to those offered by DCS. Moreover, the juvenile court is not required to place great weight on last minute compliance efforts. *See Matter of Appeal in Maricopa County Juvenile Action No. JS-501568*, 177 Ariz. 571, 577, 869 P.2d 1224, 1230 (Ariz. App. 1994) (court found mother's successful addiction recovery "too little, too late").

¶38 DCS presented sufficient evidence in support of its motion to terminate Parents' parental rights. We cannot say as a matter of law that the juvenile court could not reasonably have found that evidence to be clear and convincing. Therefore, we affirm the juvenile court's finding under § 8-533(B)(8)(b) and do not need to consider the other statutory grounds addressed by the juvenile court. *See Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205.

¶39 The record also supports the juvenile court's finding that the termination is in the best interests of the children. In order to find that termination is in the children's best interest, the juvenile court was required to find that R.J. and L.J. would "benefit from termination of the relationship" or that they "would be harmed by continuation of the relationship." *James S. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 351, 356, ¶ 18, 972 P.2d 684, 689 (App. 1998). Factors to consider include whether the current placement is meeting the needs of the children and whether an adoptive placement is available or the children are adoptable. *See Raymond v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30, 231 P.3d 377, 383 (App. 2010).

¶40 DCS presented evidence that both R.J. and L.J. would benefit from severance and would be harmed if returned to their parents. L.J. and R.J. have been placed with Mother's mother and stepfather. Vivan LaBlanc, the court appointed special advocate, testified that she believes R.J. and L.J. are both thriving in their placement. LaBlanc stated that both of the children are now meeting growth milestones, appeared happy, well-fed, and nurtured. In particular, LaBlanc pointed out that R.J. was "kind of hungry for a mother" and "needed that kind of nurturing." In addition, Sonia Salcio, the CPS case manager, testified that "these children need the stability, support, nurturing, and attention that is so crucial to children of their age. They need a parent that is going to be present in their life, and

they need to know where their home is, and they need to live in a drug-free environment."

¶41 The juvenile court found that the current placement is meeting the needs of the children and they are willing to adopt the children. The juvenile court also found that the children are both adoptable because they are "happy, healthy toddlers." These findings are supported by the evidence of record.

b. *The juvenile court's findings complied with ICWA.*

¶42 Parents assert that the juvenile court's order terminating Parents' rights was contrary to ICWA. Parents contend that this court must employ a de novo standard of review.[4] Parents are essentially challenging only the sufficiency of the evidence to support the juvenile court's ruling, however. Appellate review of this issue does not require an interpretation of the statute. Therefore, we apply a clearly erroneous standard of review. *See Denise R.*, 221 Ariz. at 93-94, ¶ 4, 210 P.3d at 1264-65.

¶43 Under ICWA, a state juvenile court must make two findings before terminating the parental rights of an Indian child. *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 333, ¶ 3, 198 P.3d 1203, 1205 (2009); 25 U.S.C. §§ 1901-1963 (2006). First, the court must find that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Second, there must be a determination "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(f).

i. DCS made active efforts to reunify the Indian family.

¶44 "Active efforts" is not specifically defined in ICWA, the Guidelines, or Arizona case law. In determining whether DCS made active efforts, we are to consider DCS' involvement with the case plan in its entirety. *Maisy W. v. State. Ex rel. Dep't of Health and Social Services, Office of Children's Services*, 175 P.3d 1263, 1269 (Alaska 2008). *See, e.g., E.A. v. State,*

---

4 We review matters of statutory interpretation de novo. *State ex rel. Arizona Dep't of Revenue v. Capital Casings, Inc.*, 207 Ariz. 445, 447, ¶ 9, 88 P.3d 159, 161 (2004).

*DFYS*, 46 P.3d 986, 990 (Alaska 2002) (court held state's lack of involvement in seven month period "insignificant in light of the extensive remedial efforts the state has provided throughout its involvement"). In addition, the court may consider Parents' lack of willing participation with their case plan in determining whether DCS has taken active efforts. *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001).

¶45        Although Parents argue that DCS did not provide them with services after their move to Maricopa County, there is sufficient evidence to show that DCS made active efforts throughout the year prior to Parents' move. It was Parents themselves who failed to actively participate in the services offered by DCS. The juvenile court's finding that DCS had made active efforts was corroborated by Haddock's testimony.

### ii. Serious emotional or physical damage.

¶46        ICWA requires that the juvenile court find beyond a reasonable doubt, "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). Guideline D.3(b) restates the statutory language and the commentary to Guideline D.3 provides in relevant part:

> A child may not be removed simply because there is someone else willing to raise the child who is likely to do a better job or that it would be "in the best interest of the child" for him or her to live with someone else. Neither can a placement or termination of parental rights be ordered simply based on a determination that the parents or custodians are "unfit parents." It must be shown that it is dangerous for the child to remain with his or her present custodians. Evidence that must be "clear and convincing" for placements and "beyond a reasonable doubt" for terminations.

¶47        ICWA does not require that the expert testimony be expressed in a particular way or parrot the specific language of the statute. *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 572, ¶ 22, 190 P.3d 180, 186 (2008). It is sufficient that expert testimony address the likelihood that there will be future harm in continuing the parent-child relationship. *Id.* In addition, it is not required that the juvenile court base its ruling solely on the ICWA expert's testimony. *E.A.*, 46 P.3d at 992 (Alaska 2002). Rather, it is required that the evidence as a whole support the court's conclusion. *Id.*

**¶48**        Haddock testified that future serious emotional or physical damage to the children was likely to result if the children were returned to Parents. Based on his review of the case, Haddock testified that Parents had failed to correct the conditions that led to R.J. and L.J. being removed. Haddock further expressed his opinion that Parents were not capable of remedying the circumstances.

**¶49**        Haddock testified that he had based his testimony on review of the tribe's case file, which included all the information and reports sent by the juvenile court, as well as ICWA's internal documents. Haddock also reviewed information "regarding services that were offered to the parent, requested for the parent, or services that they were referred to."

**¶50**        We recognize that Parents presented evidence that they have made attempts to correct the conditions which led to the removal of the children. However, the juvenile court was not persuaded that the last minute attempts made by Parents were significant. "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M.*, 203 Ariz. at 280, ¶ 4, 53 P.3d at 205. (citing *In re Pima County Dependency Action No. 93511*, 154 Ariz. 543, 546, 744 P.2d 455, 458 (App. 1987). On this record, we agree DCS presented sufficient evidence in support of its motion to terminate parental rights.

## CONCLUSION

**¶51**        Because the evidence supports the factual findings of the juvenile court and no legal error has occurred, we affirm the juvenile court's order terminating Parents' parental rights to R.J. and L.J.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh

13